## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### JOHN H. MATNEY AND J..H. STINSON V. RICHARD YATES.

September 22, 1921.

Absent, Kelly, P., and Burks, J.

1. TRUSTS AND TRUSTEES—*Resulting Trusts—Agent to Buy Land, Taking Title in His Own Name—Release of Agent from Trust —Case at Bar.*—Complainants claiming ownership to a tract of land, desiring to obtain releases of the interests of the heirs of a former joint owner of the tract employed defendant, one of the heirs, to obtain a deed of their interests from such heirs. Complainants agreed to pay defendant a reasonable compensation for his services. The purchase price that he was to pay to the heirs for their interests was strictly limited to certain specific sums. Defendant did not agree to advance for complainants any of this purchase money. Defendant found that it would take more money than anticipated to acquire the interests of the heirs, and after being informed of this, complainants did not authorize defendant to pay such enhanced price. Defendant then decided to acquire the interests of the heirs in his own name, thus taking the risk of having complainants fail to ratify his action and losing both the money paid out by him and the value of his services. Defendant then offered to convey the interests of the heirs to complainants, if they would reimburse his expenditures, which he claimed aggregated $200, and pay him the additional sum of $200 for his services.

   *Held:* That the $200 demanded by defendant for his services was a reasonable compensation, and when complainants refused to pay it they released defendant from his trust relationship to them, and defendant had a right to hold as his own the conveyance from the heirs.

2. EQUITY—*Evidence—No Evidence to Support Alleged Grant.*—In a suit involving title to a certain tract of land, defendant attempted to set up a superior title to that of complainants derived under an alleged grant from the Commonwealth.

   *Held:* That, in view of the fact that there was admittedly no

evidence in the cause of the existence of this grant, the trial court did not err in taking no action with respect to it.

3. PUBLIC LANDS—*Recording Grant in Clerk's Office of any Court— Section 2367, Code of 1904.*—As the law stood prior to the enactment of section 3393, Code of 1919, an original grant from the Commonwealth was not authorized to be recorded in the clerk's office of any court so as to become a record in such clerk's office. Section 2367 of the Code of 1904 gives no such authority, as it has reference only to new grants, issued in pursuance of the preceding sections 2365 and 2366 of the Code of 1904, based on decrees of courts in suits to supply lost or destroyed records or papers forming links in titles.

4. DOCUMENTARY EVIDENCE—*Certified Copy of Record.*—As there was no authority prior to the enactment of section 3393 of the Code of 1919, to authorize the recording on an original grant in a county clerk's office, a certified copy from the clerk's office cannot be regarded as evidence of the original.

5. ANSWERS—*Decree Pro Confesso—Refusal to Take Bill as Confessed for Want of Answer.*—In the instant case, a third amended bill was filed in the clerk's office without leave of court, and no process issued thereon against the defendant. The cause was brought on for hearing upon it by agreement of the parties, subject to the reserved right of defendant to move the court to reject the bill, which motion was afterwards made, but never passed on by the court. Meanwhile, the answer of defendant filed in the cause put in issue all the material allegations of the third amended bill, as they were the same in substance as those of the original and first amended bills.

   *Held:* That the court below did not err in not taking the third amended bill for confessed as against the defendant.

Appeal from a decree of the Circuit Court of Buchanan county. Decree for defendant. Complainants appeal.

*Affirmed.*

This is the sequel to *Matney* v. *Yates,* 121 Va. 506, 93 S. E. 694. The case as made by the pleadings as they then stood was dealt with on that appeal. The facts of the case as they were taken to be admitted on demurrer and the questions thus put in issue and decided on that appeal fully appear

14

from the report of the case just cited and need not be repeated here.

When the case went back to the court below the appellee, Richard Yates, by leave of court by order entered November 20, 1917, filed his answer to all of the bills then in the cause, to-wit, the original and first and second amended bills.

This answer is a long one and its positions need not be set forth in detail. It is sufficient to say that it put in issue all three claims of appellants made in their bills at that time filed in the cause, which were, in substance, that appellants were the complete owners of the 241-acre tract involved in the cause, First: By title by adverse possession; Secondly: By reason of the lost or destroyed deed mentioned in the report of the case on the former appeal and the acquisition by appellants of the Walter Matney title to said land, as also set forth in such report of the case; and thirdly: By reason of the alleged agency of appellee and the resulting trust as growing out of such agency because of which it is alleged in said bills that the appellants were entitled to have a decree compelling the appellee to convey to them the interests of the Richard Yates, Sr., heirs at law in said land which were extant if the appellants failed both in proof of adverse possession and in furnishing sufficient proof to set up said lost or destroyed deed. And thereupon the answer went further and attempted to set up a superior title to that of appellants to the said 241-acre tract of land derived under an alleged grant from the Commonwealth of a larger body of land which included all but about ten or fifteen acres of such 241-acre tract, such grant bearing date December 1, 1858, and having been made to one E. F. Harman and one Peter L. Surdan, which superior title the appellee claims in said answer was acquired by him by deed dated February 25, 1914, from Henry C. Stuart and wife and Harman Newbery, who as the answer alleged, were the then owners of such title through mesne conveyances and descent from one

party to another, all as set out in such answer in detail. This alleged title will be hereinafter referred to as "the Stuart title."

Thereafter on July 18, 1919, the appellants filed their third amended bill in the clerk's office, without any leave of court first obtained and without any process having issued thereon, but it appears from an order of court entered in the cause on August 5, 1919, that the cause then came on to be again heard "on the proceedings heretofore had herein and papers heretofore filed herein and on the third amended bill filed by the complainants in the clerk's office of this court on July 18, 1919, by agreement of the parties hereto, but counsel for defendant reserved the right to move to strike out the last amended bill  *   *   *."

The third amended bill was substantially the same in its allegations as those contained in the original and first amended bills in so far as they concern the matters in controversy between the parties at the time the pleadings were filed which were involved in the former appeal; the only difference in the former pleadings and the third amended bill as to these matters being this: Whereas the second amended bill admitted that "all of the parties who were connected with and who knew anything about" the execution of the alleged partition deed by Richard Yates, Sr., conveying all of his interest in the 241-acre tract of land involved in the cause to Walter Matney (being the alleged lost or destroyed deed aforesaid), "are dead and your orators are unable to prove that this deed was made;" the third amended bill did not contain this admission, but returned, in substance, to the allegations of the original and first amended bills on this subject, and claimed under and sought to set up such deed as a deed which had been executed and delivered about the year 1875 and subsequently recorded and destroyed by the fire which destroyed the records of Buchanan county in the year 1885; as well as the

positions that the appellants had acquired title to the land by adverse possession and that the appellee Richard Yates, the grandson of Richard Yates, Sr., was the agent of appellants when he obtained the conveyance to himself in 1913 of the interests of the Richard Yates, Sr., heirs at law and must be held to occupy the position of a trustee for appellants as to such interests and hence, was compellable to convey the same to appellants—all as substantially set forth in the original and first amended bills and as appears from the report of the case aforesaid on the former appeal.

The appellants introduced in evidence the depositions of a number of witnesses upon the subjects of the claims of appellants aforesaid of title to the 241-acre tract of land by adverse possession; by reason of the lost or destroyed deed aforesaid; and concerning the existence of the alleged agency of appellee, Richard Yates, aforesaid, etc.; and the appellee introduced his own deposition which had reference especially to his claim of the nonexistence of the aforesaid alleged agency on his part, and the acquisition of the Stuart title aforesaid, and the deposition of one other witness in his behalf.

Upon consideration of the whole case the court below on October 21, 1919, entered the decree under review on the present appeal, which provides as follows:

"* * * being of opinion that the complainants (the appellants) have failed in their proof, which, therefore, renders it immaterial as to whether or not the court shall sustain or reject the last amended bill on account of repugnance, or inconsistent allegations, it is now adjudged, ordered and decreed that this cause be and the same is dismissed at the cost of complainants."

Of the evidence in this case in reference to the claim of appellants of title by adverse possession aforesaid, it is sufficient to say that it wholly fails to show the acquisition of title by such possession, even of any part of the 241-acre

tract; and this is expressly admitted in the petition of appellants for the present appeal.

The petition for the present appeal calls attention to the fact that the third amended bill "alleges and seeks to set up the partition deed between Walter Matney and Richard Yates, Sr.," and contains statements of abstracts of what it is claimed that four old witnesses for appellants and J. H. Stinson, one of appellants, testify in the case on the subject of such deed; but we do not find that the petition takes the position that such evidence is sufficient to establish the execution and delivery of such a deed. Such being the attitude of the petition for appeal it is deemed sufficient to say that it appears from the testimony of the witnesses just referred to that the statement contained in the second amended bill on this subject is correct, namely, that "all the parties who were connected with and knew anything about the transaction are dead, and * * *" (appellants were) "unable to prove that this deed was in fact made," if it was made.

On the subject of the alleged agency aforesaid, there is some conflict in the testimony, but very little, if any, on material points.

The testimony for appellants is to the effect that the appellant, John H. Matney, had seen some of the Richard Yates, Sr., heirs, before the appellee, Richard Yates, Jr., was approached on the subject of acting as agent for appellants in getting such heirs to execute a release deed or conveyance of their possible interests in the 241-acre tract of land, and John H. Matney testifies that he found "that it was all right and agreeable and they would sign up theirs," and it was then that he, Matney, "got Richard Yates," * * * the appellee "and he said he could see them all and they would sign the deed for him. * * * I got him to go ahead and take the deed for me."

The following from the deposition of the appellant John

H. Matney will show the positions taken by him on this subject:

"Q. I will ask you to detail the conversation, or conversations you had with Richard Yates, the defendant in this suit, relative to obtaining a release deed from the heirs of old man Richard Yates?

"A. Well, one morning I was here in town, and I met Richard here on the street, and he asked me had I seen any of the heirs, and I told him I had seen some of them, there were three of the heirs that I had seen, and I had a talk with them and it was all right. Richard told me that they were to sign it up, as well as I remember, and we were discussing the matter, and I knew that he was one of the heirs in it, and he said he would sign over his interest in it, and I forgot now just which one mentioned it first, but Richard told me that he could get all of them to sign up the release deed without any trouble. I had to go away in a couple of days, and I didn't have time to see all of the heirs, and I told Richard that would be all right if he could do that. I had to go to Pond Creek to work for Riley Lester. He would see all of the heirs, and that probably all of them would meet him at Stone Coal, and that they would sign a release deed for him. I told him I would pay him for the trouble, and asked him what he would charge me, and he said he wouldn't charge me anything much, and I asked him if $10.00 would pay him for his trouble, and as well as I remember, he said $10.00 would be liberal payment, and I told him I would pay him if he would see all of the heirs and get them to sign the deed.

"Q. Did you have prepared a release deed and turn it over to Richard Yates?

"A. I told him that Mr. Stinson would prepare the deed when he got ready to get out and get them to sign it. I went and we went up to Mr. Stinson's office.

"Q. You say *we* went up to Mr. Stinson's office, do you mean that Richard Yates went with you?

"A. Yes, sir.

"Q. Now, I will ask you to detail as nearly as you can the conversation with Richard Yates, after you went to Mr. Stinson's office?

"A. Well, after we went up there, I told Mr. Stinson that Richard said that he could get the heirs to sign a release deed for us, without any trouble, and explain it to them, how he was one of the distant heirs, and didn't have anything in it much, if anything at all, and that as I had to go away, that he would get out and get the heirs to sign up the deed and he had promised to do it.

"Q. Was Mr. Stinson present during this conversation?

"A. Yes, sir, he was present.

"Q. Did he prepare the deed then?

"A. No, as well as I remember, he didn't prepare the deed then.

"Q. What arrangement was made about the preparation of this deed, if anything?

"A. Well, Mr. Stinson told Richard he would prepare the deed when he, Richard, got ready for to have them sign it up, and prepare the deed and send it to him.

"Q. Do you know whether or not Mr. Stinson prepared this deed?

"A. He didn't prepare that deed right that day, that I know of, but he prepared it later on.

"Q. Did Richard Yates secure the heirs of Richard Yates, Sr., to sign this release deed?

"A. The one that Mr. Stinson prepared him a deed and sent it to him, and he sent it back; said that he had left out one of the heirs, and he went ahead then and had a deed prepared himself and got the heirs to sign it.

"Q. What did Richard Yates do with this deed?

"A. As well as I remember, I believe he sent it back to Mr. Stinson.

"Q. And was the deed that he secured from the heirs of old man Yates to himself?

"A. He had it made to him, and told the heirs that he would make it over to us when we would pay him for doing the work.

"Q. Did he make the deed over to Mr. Stinson and yourself?

"A. No, he did not make it over to us.

"Q. Did you ever talk to Richard Yates about this release deed that Yates secured from the heirs?

"A. Yes, sir.

"Q. What did he say about it?

"A. While I was gone, I had heard that Richard had took the deed up in his own name, and that he was going to make it over to us when we paid it over for doing the work. At that time I didn't have the money right at present, and was aiming to raise the money and pay him when I got back. I didn't know exactly when he would get all the heirs to sign the deed, and when I came back he had the deed made in his name, and put on record.

"Q. Did you talk to Richard Yates afterwards about the matter?

"A. Yes, sir. He said he wouldn't make the deed over to us for the amount agreed upon—$10.00.

"Q. What reason did he give, if any, for refusing to make the deed over?

"A. He said that after he got to looking into the matter of the land that he found that the Yates heirs had a better title than he thought they had, and I believe he said it would cost him a little more to buy them out than he had thought, and he couldn't sign the deed over to us to what he had paid the heirs for $10.00, but he said he would make the deed over to us for $400.00, and he would assign the deed over to us if we would pay him $400.00.

"Q. Did he say how much it had cost him to secure the release deed?

"A. About $10.00 to the heirs, as well as I remember.

"Q. Were you ready to pay Mr. Yates the $10.00 and the amount that he had paid the heirs for the release deeds?

"A. Yes, sir. When I come back to see him later on I was ready to fix up the matter and pay him for it.

"Q. Did Mr. Yates ever present the deed to you with a bill?

"A. No, sir; he never presented me a deed or bill. He told me that he wouldn't make it over, and I told him that I felt the Matneys had owned the land long enough and had been in possession of it, as we had always had in it quiet possession, and everybody, as well as myself, regarded the land as belonging to the Matneys heirs.

"Q. And what did Richard Yates say, if anything?

"A. I told him that we could win the land and hold it by law, and I said as it was our land we had been paying the taxes on it, and nobody had ever been disputing our right to this land, and also regarded it as our land.

"Q. Well, now, what did Richard Yates say?

"A. Richard told me that we didn't have any deeds for it, had been burnt up, and there wasn't anything to prove that old man Walter Matney and Richard Yates had swapped land or traded their lands. This was the conversation between us, as well as I remember. He told me if I would pay him $400.00 he would make the deed over to us."

*Cross-Examination.*

     *          *          *          *

"A. Well, he wouldn't agree to take what we offered to do the work for us. I was aiming to pay him when we got the money.

"Q. You didn't give him a penny with which to buy the interest of these heirs, did you?

"A. No, not at that time. I was getting ready to furnish him the money. I didn't know how much it would take me.

"Q. Well, you went to Pond Creek about that time?

"A. Yes, sir.

"Q. Did you write him a letter back and tell him that you had changed your mind about the matter?

"A. Well, I believe that he wrote to me; that I received a letter from Richard, stating that it would take more than we had figured on buying some of them out, and I didn't have quite enough money at that time, and I believe that I wrote him to delay the matter, or stop until I came up; at least, that is what I meant—that to wait until I came and seen him.

"Q. But you wrote and told him not to take the matter up at that time, didn't you?

"A. Well, I think I did write to him; of course, I meant to wait until I came and advanced him the money and get me to back it up.

"Q. I am not asking you what you meant; I am asking you what you wrote Richard Yates, and it is true when he wrote you and told you that it would take more money to buy the interest of these heirs than you had figured, or anticipated, you wrote and told him to let the matter alone, and not to take it up at that time, didn't you?

"A. Yes, right at that time. I thought he was going ahead, and I wanted to come up and make arrangements with him.

"Q. Now, I didn't ask you what you thought; I am asking you what you wrote Richard Yates. You wrote him just what I have stated to you above in these questions, didn't you?

"A. Yes, I remember writing him that, of course, when I wrote him I didn't mean for him to lay the matter down.

"Q. Do you mean to say that you would write a man and tell him not to do a thing, and you would then expect him, in the face of that writing, to go on contrary to your instructions and do the thing? Is that what you mean?

"A. No, sir; of course, when I wrote him I didn't have

the money right then, and couldn't get off, and decided I would get him to delay it until I came up, and I didn't know how much it would take, and everything.

"Q. But you didn't mean you intended to do nothing after you wrote him to stop and let the matter alone, did you?

"A. Well, I am not sure; I guess I wrote him that. I remember that I was trying to get ready in a few weeks to come up, and I wanted him to wait.

"Q. Did you write him your construction, and what you meant and had in your mind that you wanted him to do which was contrary to the writing which you were sending him?

"A. I know I wrote him two or three letters; I am not sure how many letters I wrote him.

"Q. You intended him to obey your writing, didn't you?

"A. Yes, what I meant—for him to stop right then for a while, that I was in a hurry to do the work.

"Q. He did stop, and didn't undertake any further to get the deeds for you, did he, after you wrote him that?

"A. I thought he would wait until I got back to proceed with his work.

"Q. You didn't write him and tell him to stop and then expect him to go on, did you?

"A. I didn't expect for him to go on until I come back.

"Q. He did write you that it would take more money than you expected to put up to buy the interest, didn't he?

"A. As well as I remember, he wrote me that.

"Q. And it was in response to that letter that you wrote and told him to not go further with the matter?

"A. Yes, sir; right then.

"Q. And then when you saw Richard Yates next he had bought this to you, hadn't he, and had taken his deed for it?

"A. Yes, sir.

"Q. And when you talked to him he told you that upon receiving your letter he turned the deed back to Mr. Stin-

son, which Mr. Stinson had given him at your instance to get the Yates to sign?

"A. No, sir, I don't remember of him telling me that.

"Q. You found out that was true, didn't you?

"A. Well, I found out that he returned the deed back to Mr. Stinson, because one of the heirs was left out; that was why he turned it back.

*     *     *     *

"Q. I am not asking you how you felt about the matter, but I am asking you what you done. When Richard Yates next saw you, after he had taken the deed in his own name, and after you had wrote him to stop, he told you that he had had the title looked into, and found that it was different to what you thought it was, didn't he?

"A. After he got the deed in his own name, he told me that.

"Q. He told you that he found that your grandfather had willed the Watkins branch land to his daughters, didn't he?

"A. Well, we had so much conversation about it, I am not sure about it.

"Q. He also told you that a number of the heirs of Richard Yates contended that their father never did dispose of his interest in the Bear Tree hollow land, didn't he?

"A. Yes, I remember him saying that, but if they had the deed were burned up.

"Q. Any way, he told you that different ones of these heirs which he had seen, had contended that their father had not sold his interest in the Bear Tree land, but that he owned it at his death, and that it would take more money to buy their interest than to make a mere release deed to him, didn't he?

"A. Well, I remember him saying that he couldn't turn us, and get the deed for what he had to pay the other heirs. The Yates heirs that he had talked to wouldn't sign it for the money that we agreed for.

"Q. Didn't he write you in that letter to Pond creek and tell you in that letter that the heirs of Richard Yates, Sr., had informed him that their father had not disposed of his interest in that land, and for that reason that they would have to have more money, if they sold their interest, than you had agreed?

"A. Well, I believe he did write me as to one or two of the heirs might have to have more money."

\*          \*          \*          \*

The following from J. H. Stinson, the other appellant's deposition, will show the positions taken by him on the same subject:

"Q. What did you do with reference to securing a release deed from the heirs of Richard Yates, Sr., if anything?

"A. I had a talk with John Matney about it. We talked two or three times about it, I expect, and one day John Matney came into my office, and said he had been talking to Richard Yates, and that Richard Yates had agreed to get parties to sign the deed, and said he was in town, and I told him to go out and bring him in my office, and he went out and he and Mr. Yates come into the office.

"Q. What was said, if anything, by Richard Yates, relative to obtaining the release deed?

"A. I explained to Mr. Yates what Mr. Matney had said; that he was willing to get this release deed for us, and that I had a conversation with John Matney, and had agreed to get the deed, if he wanted him to; and I asked him what he thought about it, and he said that he felt like he wouldn't have any trouble to do it, and John Matney spoke up at the time and said that Richard was related to the parties; he would probably do the work better than we could, and he said also that he believed that he could do it better than we could and said that he was willing to do it, and that he thought they would sign the deed without any trouble.

"Q. What arrangements, if any, did you make with Richard Yates relative to obtaining this release deed?

"A. He agreed to go and get the parties to sign it, and, as I understood it, he and Mr. Matney had agreed on $10.00 for his services, and I told him that I was willing to pay him any amount and pay him any additional expenses that he was out and any amount that was right for his services, and if he was out anything we would pay him that additional, and he said that was all right, and we agreed on so much, and I believe it was $10.00 an heir, except the John R. Yates heirs. John R. Yates was one of Richard Yates' heirs, who had died leaving some several heirs, and we were to pay them $2.00 each, Richard Yates being one of them, and he agreed to take $2.00 for his interest, and I took the list of the names of the heirs to prepare the deed from, and prepared the deed and mailed it to him, and I was going away at the time, and when I come back home I received the deed back; he had either left it there at the house or sent it; any way, the deed was at the house when I got back, and stating that there were two or three of the heirs' names left out. I don't know whether Richard had failed to give them to me in the memorandum, or whether it was an oversight in preparing the deed. I don't remember, and I was not well at that time, not able to do anything much; had gone away for a little while, and I come back, and another time that I come back, I don't remember just how long, I prepared another deed, and I saw Richard and named it to him, and he said that I needn't give it to him, that he had already taken the deed, and that he had gotten Dolphus Smith to prepare a deed, and he had taken in his own name; I think he told me that Dolphus prepared it, I think that is what he said. I was at one other time on the street somewheres, and I met Richard and he said something or other about some money, and I was starting for some place or other, and I said I haven't got any money with me, and I told him that if he would put the money up, and pay them that I would give him a check for it, and would pay him

for the use of the money, and he agreed with me that he would do it, and that is the only time that he ever called on me for money.

"Q. Did he ever intimate to you that he was obtaining **the deed** in his own name?

"A. He did not.

"Q. When you saw him on the occasion that he told you that he had already taken the deed to himself, did he say why he had done this?

"A. I don't believe he did; if he did, I don't remember.

"Q. What did he say at that time about making you and Mr. J. H. Matney a release deed for the land?

"A. He first said he wouldn't make it, and I talked to him a while, and he said he thought it was his, and he had the deed for a one-half interest in it, and he would sell it to us. I told him that wouldn't be treating us right, and I didn't think that he was that kind of a man to do that way, and after talking some he talked like he would take $400.00 if we would give it to him, and I told him that I thought that was too much."

&ast;          &ast;          &ast;          &ast;

&ast; &ast; &ast;

"A. I had no such conversation with Richard Yates, except that I told him that when to take the deed, and asked me $400.00, and I told him I could set it up cheaper than that, and I would do it. That is the only time I had any conversation of that kind with Mr. Yates, and the conversation that you refer to that I had with him at Matney, or in the street of Grundy, I know I was going somewhere and met Mr. Yates and something was said about some money, and I told him I didn't have the money with me, and if he would advance the money I would give him a check for it, and he agreed to do so.

"Q. How much was he to advance?

"A. Whatever was necessary to get the deed. We had an agreement with them to pay them so much apiece.

"Q. How much apiece?

"A. The Yates heirs, Richard and his brothers and sisters, was to be paid $2.00 apiece; I mean the agreement we had with Richard Yates, and I understood that it was satisfactory with all of them, and my recollection is that the others was $10.00, and it was $10.00 for Richard Yates' heirs, but there were probably six or seven of them we agreed to pay $2.00 apiece.

\*          \*          \*          \*

"Q. You haven't paid one cent?

"A. I have not.

"Q. And you have never fixed any amount with Richard Yates to pay him?

"A. I offered to pay him what was right and reasonable for his services and to pay him all of his money back, and he refused to make us the deed at all, except just sell us his interest in it; but after discussing the matter with him a while agreed to make us the deed for $400.00."

Richard Yates, the appellee, testified in substance that he did have the conversation with the appellants as to which the latter testified, and that he did agree to act as agent for them in getting the Yates heirs to sign a deed or release deed conveying their interest in the 241-acre tract of land to appellants, but that he (the appellee) did not agree to put up the money for appellants. Then follows the following testimony of appellee:

"Q. You may state what was done by you and Mr. Matney and Mr. Stinson in reference to procuring this release deed?

"A. I saw some of the parties—nearly all of them—and they said they would release it, and I spoke to Mr. Stinson and he prepared me a deed and left it in the mail-box, and then I saw him at Matney on the same day and he wanted me to put up the money and go and get it up and I told him no, I would not go.

"Q. Did you tell him you would not put up the money?

"A. Yes, sir.

"Q. After you saw Mr. Stinson at Matney, did you see some of the Yates heirs immediately following that?

"A. Yes, sir.

"Q. You can state what ones you saw?

"A. Uncle William Riley Smith and Aunt Marinda Smith.

"Q. You may state if Marinda Smith was one of the Yates heirs?

"A. Yes, sir.

"Q. When did you see them, in reference to the time you saw Mr. Stinson at Matney and the time he informed you he left the deed in your mail-box?

"A. The same evening.

"Q. I will ask you if they agreed they would execute the release deed?

"A. They asked me if I had the money, and I told them I did not, and they says, 'Will you stand good?' I said, I won't, and then said you need not present any deed to us until you present the money.

"Q. At that time did you see the deed?

"A. No, sir.

"Q. Immediately following that conversation with Mr. and Mrs. Smith on the same evening, did you get the deed from the mail-box?

"A. Yes, sir.

"Q. What did you find when you received the deed in reference to the parties to the deed?

"A. Some of the heirs' names were left out of the deed.

"Q. What did you do then?

"A. I brung it back to Mr. Stinson's office and gave it to Mr. Lindsay, or gave it to Mr. Stinson on the road, I don't know which.

"Q. Did you inform Mr. Stinson or Mr. Matney either, that the deed was not correctly written, as to the parties?

"A. I informed Mr. Stinson. I met him on the road between here and where I live and told him some of the heirs' names were left out.

"Q. At the time you returned the deed to Mr. Stinson, I will ask you if he said anything further to you in reference to getting the release deed?

"A. No, sir.

"Q. I will ask you if, after returning this deed to him, you understood and considered at any time you were to do anything further in reference to the matter?

"A. No, sir.

"Q. Did Mr. Stinson or any one for him, or Mr. Matney, pay to you one cent with which to obtain this title, at any time?

"A. No, sir.

"Q. At the time you returned the deed to Mr. Stinson and at the time you say you considered the matter was at an end, so far as you were concerned, did you then know the status of this Yates title?

"A. No, sir.

"Q. I believe you say you are not clear to just whom you returned the deed to, either Mr. Stinson or Mr. Lindsay—am I correct?

"A. Yes, sir.

"Q. I will ask you if the Mr. Lindsay you refer to was a law partner of Mr. Stinson's?

"A. I think so.

"Q. Was he working in Mr. Stinson's office?

"A. Yes, sir.

"Q. After you returned the deed to him you may state if you gave him information and instructions as to the names being left out of the deed or not?

"A. I don't remember whether I did or not.

"Q. However, you do remember, if I understood your evidence, that you saw Mr. Stinson and told him as to the condition of the deed, am I correct?

"A. Yes, sir.

"Q. After you had returned this deed and informed Mr. Stinson that the deed was not correct, and after you say you considered the whole matter at an end, so far as you were concerned, I will ask you if you took any steps to ascertain the condition of this Yates title to the 241-acre tract?

"A. Yes, sir.

"Q. You may state what you did in reference to obtaining this information?

"A. I came to Grundy one day and got you (meaning Mr. Daugherty) to look the record up and see if it was what it had been reported to me, and you did, and found it was different from what it had been reported to me.

*        *        *        *

"Q. Upon finding that the correct status of the title to this tract was entirely different to what they had represented it to you to be, you may state whether or not your counsel advised you that, in his opinion, the legal title rested in the Yates heirs, according to the information he had received from the records to an undivided one-half interest in this tract.

*        *        *        *

"A. Yes, sir.

"Q. Following the opinion and advice of your counsel, you may state, then, what you did in reference to a purchase of the interest of the Yates heirs to this land?

"A. I went and bought it for myself. I found that I had an interest in it myself and saw that it was different.

"Q. I will ask you whether Mr. Stinson and Mr. Matney proposed to pay, if anything, for the release deeds to this land?

"A. Matney told me if I would go and see the parties and see what they would do, he said, 'I will make you a present of $10.00 and will pay you extra for your trouble, and will take the matter up with Mr. Stinson,' and Mr. Stinson told me the same thing.

*              *              *              *

"Q. You may state the total cost of obtaining the Yates branch of this title.

"A. It cost me $200.00.

*              *              *              *

*"Cross-Examination.*

"By Mr. Pobst:

"Q. Mr. Yates, you first undertook to procure the release deed from the heirs of Richard Yates, Sr., for and on behalf of complainants in this suit, John H. Matney and J. H. Stinson, did you not?

"A. Yes, sir.

"Q. When you started out to procure this deed and to see these heirs, you were working for John H. Matney and J. H. Stinson, were you not?

"A. Yes, sir.

"Q. Did you ever tell John H. Matney and J. H. Stinson that you had decided to quit working for them and procure the deed for yourself?

"A. No, sir; not before I brung the deed back to them, I did not.

"Q. Did you ever tell them before you got your deed from the heirs?

"A. No, sir."

The testimony of William Riley Smith, although a witness for appellants, on the subject of requiring the money to be paid him before he executed the deed to appellants, etc., is as follows:

"A. Well, he" (appellant) "come here before that time. He come here first and said he wanted to know what we would take for it and said he was buying it for Stinson and Matney, and we told him we would take $12.00 for our interest, and he come back after that, maybe six months afterwards, and fetched the deeds from Stinson for us to sign, and I asked him if he had the money, and he said that he

did not have it, and said that they would send; said that
Stinson said he would pay for it, and I told him, 'I will
make the deed if you have the money,' and he said he did
not have it, and I said we are not going to make it, and we
didn't, and it was *two or three months after* that he passed
out by the gap and said, "I have taken a notion to buy that
myself,' and said, 'Will you make me a deed?' and I said
we will sell to anybody that will pay us the money." (Italics
supplied.)

Floyd Matney, another witness for the appellants, testi-
fied as follows with respect to statements made by appel-
lant at the time the latter obtained the deed from the wit-
ness:

"Q. I wish you would state what Mr. Yates said. What
did Dick say to you relative to his name appearing in the
deed as a grantee?

"A. Well, Dick, when he come over there with the deed,
and the magistrate, I just thought he was coming to take it
up for John Stinson, but we got into a talk, and he asked
me if I would care to sign the deed, that he was taking it
up in his own name, and he would let them have it, as he
had been trying to get John Stinson to put him up the
money; that they would sign the deed, and that as they
hadn't done it, and Dolphus Smith was about to take it up,
was thinking about taking it up, and taking care of it;
that he would let them have it and could do it all just as
eas*ier* as he could to get his interest, and he was putting his
own money in it, and all he wanted was a reasonable profit
for the use of his money.

"Q. Did he represent to you that he was going to obtain
the release deed for John Matney and J. H. Stinson? * * *

"A. Yes, sir.

"Q. Well, now, I will ask you to state exactly what he
said about letting Stinson and Matney have the land?

"A. Well, he said he would let them have it; pay him

back his money and a reasonable profit for his trouble, that he would let him have it.

"Q. Why did he say he was taking the deed in his own name?

"A. To be safe with his money."

The evidence of the existence of the Elder patent, of date December 1, 1858, to E. F. Harman and Peter L. Surdam, and other pertinent matters are referred to in the opinion of the court.

. *H. Claude Pobst,* for the appellant.

*A. A. Skeen* and *W. A. Daugherty,* for the appellees.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court: .

The chief question presented for our decision by the assignments of error is the following:

[1] 1. Did the appellants have the right to claim that the appellee held the conveyance from the Yates heirs in trust for appellants after appellee offered to convey the interests in the 241-acre tract thus acquired, and also his own interest in such land derived by descent, if appellants would refund to him his actual outlay of $200 and pay him $200 for his services?

This question must be answered in the negative.

The law of the case was determined by the opinion and decision of this court on the former appeal, as appears from the report of the case above referred to (121 Va. 506, 93 S. E. 694), and that holding need not be set forth here, except to say that it was based on the assumption of the correctness of the allegations of the pleadings of appellants, among which was the allegation that they had offered to pay appellant for his services and to reimburse him in full

for all cost and expense which he had incurred in connection with the matter.

We are, therefore, now concerned solely with the facts of the case.

There is no controversy about the fact that at some time, over three months before appellee thought of or undertook to obtain the conveyance from the Yates heirs to himself, the appellee did undertake to act as agent for appellants in getting the Yates heirs to execute the deed to appellants. And while there is some controversy as to what compensation the appellant, Matney, first agreed to pay the appellee for his services, the preponderance of the evidence clearly shows that before appellee undertook to act as agent in the matter both of appellants agreed to pay him a reasonable compensation for his services. Nor can there be any doubt, as we think, that the sum of $200 was but a reasonable compensation for appellant's services under the circumstances disclosed by the evidence.

The circumstances last referred to, as established, as we think, by the preponderance of the evidence, are as follows: By the terms of the agency agreement entered into between appellee and appellants, in the appellant, Stinson's office, the purchase price to be paid to the respective Yates heirs was strictly limited to certain specific sums. Appellee was not authorized to obligate the appellants for anything more. Indeed, it was not then anticipated that any of the Yates heirs would demand any greater payment. It clearly appears that at that time the appellee did not agree to advance for appellants any of this purchase money. Both Matney and Yates in substance concede this in their testimony. The agency of the appellee was a mere ministerial one, not coupled with any interest. He could not go on with the contemplated purchase from the Yates heirs any longer than the appellants wished him to do so. The whole matter was executory. They had the right to abandon the undertaking

at any time by not consenting to be bound for, or by not putting up the purchase money when called upon to do so. Stinson does testify that on a subsequent occasion, when the appellee "said something or other about some money," that he (Stinson) requested appellee to put up the money and that appellee agreed to do it. Appellee in his testimony positively denies that he made such an agreement, and says, in substance, that he affirmatively stated to Stinson when the latter made that proposition, that he (the appellee) would not go on with the agency undertaking any further. At this time appellee had found that it would cost more money to obtain the conveyance from the Yates heirs than had been anticipated as aforesaid. Therefore, the money Stinson says appellee mentioned as aforesaid must have been the greater prices which appellee had found would have to be paid. Now, if it had been then agreed between appellee and Stinson, as Stinson says was the case, that appellee undertook to go ahead and put up the money upon Stinson's authorization that he should do so, and upon Stinson's personal promise to repay him the loan, there was no occasion for appellee to have had the correspondence with Matney on the subject, shown in the evidence, which, in effect, asked that appellants put up the purchase money. Matney admits in his testimony that this correspondence occurred. This is conduct *ante motam litem,* which is a most convincing character of evidence; and, as we think, turns the scale in weighing the conflicting evidence, consisting of the statements of appellee and Stinson aforesaid, so that there is a preponderance of evidence in favor of the correctness of the testimony of appellee on this subject. We therefore conclude that the testimony of Stinson, aforesaid, on this subject, must be discarded, and that the established fact is that appellee at no time agreed to supply any of the purchase money. The testimony of Stinson on the subject being discarded, we must and do

also conclude the fact to be that, after appellee informed appellants that it would take more money than had been anticipated to acquire the Yates heirs deed, neither Stinson nor Matney authorized appellee to pay such enhanced price. Matney admits in his testimony that he was noncommittal on the subject, to say the least. As the matter stood thereafter, following the letter of Matney to appellee, asking the latter "to delay the matter or stop until I (Matney) came up," neither Stinson nor Matney were obligated to refund to appellee one cent of the price necessary to be paid if he went on with the purchase of the Yates heirs. As aforesaid, appellee had no authority to go on with the purchase, or make appellants debtors to him without the authority from them to do so. In this situation the appellee found that some one else was contemplating making this purchase if he did not. In that emergency he decided to act and take the risk of having the appellants fail to ratify his action in going on with the purchase. This he did when he furnished the purchase money and took the deed to himself. He thus risked the loss both of the money paid out and the value of his time occupied about the matter, if his agency should be repudiated by appellants and the Yates heirs' title should prove to be inferior to the Elder title under the lost deed claimed by appellants.

Further, while the evidence for appellee would not perhaps be considered as sufficiently specific to establish that his outlay in cost and expenses incurred in obtaining the conveyance from the Yates heirs aggregated the sum of $200, making up the sum of $400, if that had been made an issue in the case, this should be said: The appellants did not base their refusal to accept appellee's offer presently to be mentioned on the ground that such outlay did not amount to $200, and, hence, did not make that an issue in the case.

And aside from the question of whether the agency aforesaid was or was not terminated by the failure of appellants

to put up the purchase money found necessary to acquire the Yates heirs' deed, or to authorize appellee to pay that price, the following is the fact admitted by both of appellants in their testimony, namely: After appellee had obtained the deed from the Yates heirs to himself, he informed appellants of this and offered to convey the Yates heirs' interests thus acquired over to the appellants, if the latter would reimburse the appellee his expenditures, aforesaid, which he claimed aggregated $200, and would pay him the additional sum of $200 for his services aforesaid in procuring the deed, which services consisted not alone of personal services about the matter, but also of the service of putting up and risking, as aforesaid, the loss of the purchase money paid out by him. This the appellants positively declined to do, not because they denied that the expenditures aggregated the amount of $200, but because they were unwilling to pay appellee $200 for his services.

The decision of the question under consideration turns then upon the decision of whether the sum of $200 was a reasonable compensation to appellee or an unreasonable sum. We have no hesitancy in holding that it was no more than a reasonable compensation under the circumstances, and that when appellants refused to pay it they released the appellee from his trust relationship to them growing out of his former agency, and that appellee, thereafter, and at the time the suit was instituted and the decree was entered, had the right to hold as his own the conveyance aforesaid from the Yates heirs.

The remaining questions presented to us for decision by the assignments of error will be disposed of in their order as stated below.

[2] 2. Did the court below err in taking no action with respect to the alleged Stuart title, and in not requiring the appellee to convey to appellants a half interest in the Stuart title sought to be set up by appellee in his answer as the

superior title, on payment by appellants to appellee of half of the purchase money paid by the latter for the Stuart title?

This question must be answered in the negative.

There were various positions on the subject of the Stuart title taken in the cause by appellants. First, they denied that there was any evidence in the cause that the alleged Elder patent on which this claim of title by appellee is based had any existence. Secondly, they claimed that if the first position was untenable there was a broken link·in the chain of this title from the patent to appellee by reason of a certain tax deed being void for certain reasons which need not be here set out. And thirdly, they claimed that if both the first and second. positions were untenable, the appellee should be held to have purchased the Stuart title for the joint benefit of himself and appellants and be compelled·to convey a half interest in such title to appellants on payment by them to appellee of half the purchase money the latter paid for the Stuart title.

The appellee took issue with the appellants upon all of these positions, and these several matters were. argued at length in the petition, in the briefs and orally by counsel for the respective parties, and numerous authorities have been cited on the different questions raised: but in view of the objection made by the appellants themselves, that there is no evidence in the cause of the existence of the Elder patent in question, and of our view that this position is well taken, we cannot in this case enter upon any consideration of these various questions, other than the single one of whether there is any evidence in the cause of the existence of such patent.

Confining ourselves, therefore, to this single matter, as bearing upon the question next above stated and now under consideration, we find the situation to be this:

The only evidence in the record of this cause of the ex-

istence of the alleged Elder patent mentioned is what purports to be a copy from a patent book in the clerk's office of Buchanan county, certified by the deputy clerk of that county in the following form:

"A copy, teste:

"W. L. Dennis, clerk, by J. W. Deskins, D. C."

The evidence in this cause was introduced, and, indeed, the decree under review was entered, prior to the Code of 1919, and hence, the subject under consideration is governed by the statute law as it then existed. Sec. 3393, Code 1919, had not then been enacted.

By section 3334, Code 1904, the following is provided: "A copy of any record * * * in any clerk's office of any court * * * may be admitted as evidence in lieu of the original. * * *."

[3-4] The question is, was an original grant from the Commonwealth, such as that in question, as the law then stood, authorized to be recorded in the clerk's office of any court, so as to become a "record" in such clerk's office?

It is contended for appellee that section 2367, Code 1904, gives such authority; but we think not. An examination of that section discloses that it has reference only to new grants, issued in pursuance of the preceding sections 2365 and 2366 of Code 1904, based on decrees of court in suits to supply lost or destroyed records or papers forming links in titles; which constitute a different character of grants from that of the grant in question before us.

Section 2350, Code 1904, provides that such a grant as that in question before us shall be recorded by the Registrar of the Land Office in his office; and section 2352 provides that he shall keep a separate index for each county of all patents for lands lying in this State.

We are of opinion that in accordance with the statute law as it stood at the time the question under consideration arose, the grant in question was not authorized to be re-

corded in the clerk's office of Buchanan county; that it was therefore not a "record" in such office; so that the certified copy aforesaid from such office cannot be regarded as evidence of the original. Hence, there is no evidence in the cause before us of the existence of such a patent.

Therefore, aside from all other questions involved, we are of opinion that there was no error in the action of the court below in taking no action with respect to the alleged Stuart title. The numerous other questions with respect to the Stuart title raised by the parties in this cause were moot questions before the court below and they are moot questions before us. Hence, we do not pass and must not be understood as passing upon any of them.

[5] 3. But one other matter remains to be disposed of. The petition for appeal calls attention to the fact that no answer was filed by the appellee to the third amended bill, and it is contended that the court below erred in not taking that bill for confessed as against the appellee.

We think there was no error in the action of the court in this regard. The third amended bill was filed in the clerk's office without leave of court. No process issued thereon against the appellee. The cause was brought on for hearing upon it by agreement of parties, subject to the reserved right of appellee to move the court to reject the bill, which motion was afterwards made. The court never passed on that motion, so that the time never arrived where it was incumbent upon appellee to answer such bill. Meanwhile the answer of appellee filed in the cause put in issue all the material allegations of the third amended bill, as they were the same in substance as those of the original and first amended bills, and no objection was made by appellants to the admissibility of the testimony introduced in behalf of appellee bearing on such issues on the ground that such testimony was not within the issues in the cause; and appellants, indeed, introduced proof bearing upon the same issues.  ·

The decree under review will be affirmed, without prejudice to either the appellants or appellee to assert and rely upon the existence or nonexistence of the Elder patent aforesaid, and any rights they may claim respectively under or as against the Stuart title, or to take and have hereafter determined any positions they may choose, respectively, on the subject of the alleged right of appellants to require the appellee to convey to appellants a half interest in such title on payment by appellants to appellee of half of the purchase money paid by the latter for such title, as freely as if this case had not been decided as it has.

*Affirmed.*